UNITED STATES of America, Appellee,

v.

PORTSMOUTH PAVING CORPORA-
TION and R. Curtis Saunders,
Jr., Appellants.

No. 81–5157.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1982.

Decided Nov. 8, 1982.

Rehearing and Rehearing En Banc
Denied Jan. 27, 1983.

Gary J. Spahn, Richmond, Va., (James C. Roberts, Anthony F. Troy, Barbara Tessin Jones, Robert D. Seabolt, Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for appellants.

Marion L. Jetton, Dept. of Justice, Washington, D.C. (Hays Gorey, Jr., Diane R. Kilbourne, Teresa H. Clinton, Dept. of Justice, William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Dept. of Justice, Washington, D.C., on brief), for appellee.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

On November 25, 1980, the appellants, Portsmouth Paving Corporation and its president R. Curtis Saunders, Jr., were indicted, together with three other corporations and eight other individuals, for conspiracy to allocate contracts and to rig bids in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. After several plea agreements, the Government brought to trial two corporate and five individual defendants, including the appellants. Following an eight-day trial beginning on February 23, 1981, the jury was unable to agree on a verdict and the district court declared a mistrial. Subsequent to a ten-day second trial that began on April 20, 1981, the jury returned guilty verdicts against Portsmouth Paving, Saunders, and three other defendants, not parties to this appeal; two individual defendants were acquitted. Portsmouth Paving and Saunders were fined

$400,000 and $30,000, respectively, and Saunders was also sentenced to imprisonment for a period of time not exceeding 120 days with probation for three years following release. They then filed this appeal.

The appellants were charged with combining and conspiring "[t]o allocate . . . roadway construction and surface paving contracts" and "[t]o refrain from bidding or to submit collusive, non-competitive and rigged bids . . . in connection with the roadway construction and surface paving contracts let in the Tidewater area" of Virginia by federal, state, and local authorities. The Tidewater area was defined in the indictment to include the cities of Chesapeake, Norfolk, Portsmouth and Virginia Beach.[1] The indictment also alleged that the defendants conspired "[b]eginning sometime in or about 1963, and continuing thereafter, the exact dates being unknown to the grand jury." The purported agreement covered

two types of projects: Annually scheduled resurfacing work in each of the four Tidewater cities and other nonscheduled projects throughout the Tidewater region. According to the Government's theory, the conspirators would trade projects among themselves by agreeing to withhold bids or to submit artificially high "*complementary*" bids on certain projects.[2] Citing several sources of error, however, the appellants contend that their convictions should be reversed.

I

■ Portsmouth Paving and Saunders argue at considerable length that the evidence presented against them at both trials was insufficient as a matter of law to sustain the jury's verdict.[3] In determining whether the evidence was sufficient to prove the offense charged,[4] we must con-

1. Also included in the Tidewater area were "all contiguous territories owned by or subject to the jurisdiction of the United States of America."

2. The specific actions alleged by the grand jury included "among other things" the following:
    (a) Discussing the submission of the prospective bids on roadway construction and surface paving contracts;
    (b) Agreeing that a corporate defendant or co-conspirator would be the low bidder on designated roadway construction and surface paving contracts;
    (c) Refraining from bidding or submitting intentionally high or complementary bids on designated roadway construction and surface paving contracts on which a corporate defendant or co-conspirator had been designated as the successful low bidder; and
    (d) Submitting bid proposals containing false, fictitious and fraudulent statements and entries.

3. The appellants are entitled to have the judgments against them vacated if the evidence presented by the Government at either trial, when considered separately from that of the other trial, was insufficient to sustain their convictions. This necessarily follows from our recent decision in *United States v. Ellis,* 646 F.2d 132 (4th Cir.1981), where we held that the denial of a motion to dismiss for reasons of insufficient evidence, which motion is couched in double jeopardy terms and filed following a mistrial, is not a final order appealable under 28 U.S.C. section 1291. In the instant case, after the district court had denied the defend-

ants' motion to dismiss on double jeopardy grounds subsequent to declaring a mistrial, this court ruled that retrial would not offend the double jeopardy clause and, in response to the argument of two defendants, concluded that the final judgment rule of 28 U.S.C. section 1291 precluded the court from deciding whether the evidence at the first trial was sufficient. *United States v. Contractors Paving Co., Inc.,* No. 81–5092 (4th Cir.Apr. 10, 1981). (Unpublished).

Now that Portsmouth Paving and Saunders have been convicted, however, we are constrained to review the sufficiency of the evidence presented at both trials. If the evidence was insufficient at the first trial, the defendants' claim under the double jeopardy clause quickens, protecting the defendants from the consequences of the second trial. *See Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978); *United States v. United States Gypsum Co.,* 600 F.2d 414, 416 (3d Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979). If the evidence at the first trial was sufficient, thereby shielding the second trial from double jeopardy attack, we must consider the sufficiency of the evidence presented at the second trial, as in any other criminal case, to determine on the merits whether the conviction is supportable.

4. The appellants suggest that the indictment was overbroad or vague. We note, however, that the nature of a long-term conspiracy in violation of the antitrust laws necessitates allowing indictments worded in less than perfectly explicit terms. *See United States v. Flom,*

sider whether any rational trier of fact could find guilt beyond a reasonable doubt when the evidence is viewed in the light most favorable to the Government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Shaver,* 651 F.2d 236, 238 (4th Cir.1981). Application of that standard in this case compels the conclusion that the evidence was more than sufficient.

■ As a necessary predicate to defining the essential elements of the crime, we note that the contract allocation and bid rigging scheme alleged in the indictment is illegal per se under section 1 of the Sherman Act. *See United States v. Koppers Co., Inc.,* 652 F.2d 290, 293 (2d Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981) (bid rigging, territorial allocation in Connecticut highway maintenance); *United States v. Azzarelli Construction Co.,* 612 F.2d 292, 294 (7th Cir. 1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980) (bid rigging on Illinois highway projects); *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977) (bid rigging on sales of reinforcing steel bars). Section 1 proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." Early in the history of the statute, the Supreme Court read section 1 to prohibit only those agreements resulting in unreasonable restraints of trade. *See Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Notwithstanding the unreasonableness requirement, certain business agreements, because of their inherent tendency to eliminate competition, are presumed unreasonable and are therefore illegal per se. *See Northern Pacific Railway Co. v. United*

*States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1356 (9th Cir.1982). Under such circumstances, the Government is not required to prove unreasonableness.

■ Price fixing agreements are typical of those agreements per se violative of the Sherman Act. *See United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 309–10, 76 S.Ct. 937, 940, 100 L.Ed. 1209 (1956); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129 (1940); *National Electrical Contractors Association v. National Constructors Association,* 678 F.2d 492 (4th Cir.1982); *United States v. Society of Independent Gasoline Marketers,* 624 F.2d 461, 465 (4th Cir.1979), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981). Even more egregiously contrary to vital competition among businesses, however, is the contract allocation agreement charged in the instant case. Such an accord eliminates not only price competition, but also competition in service and product quality. 1 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 4.35, at 221 (4th ed.1981). Moreover, the collusive bid rigging dimension of the conspiracy charged makes the arrangement little less than a cartel,[5] which is "never legally nor economically justifiable." *Id.* § 4.20, at 109. The undisputed effect is to force the contracting government entities to pay more for the goods and services sought than they would "'had there been free competition in the open market.'" *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 539 n. 1, 63 S.Ct. 379, 382 n. 1, 87 L.Ed. 443 (1943) (circuit court's description of "collusive bidding scheme" to defraud the United States); *see United*

---

558 F.2d 1179, 1183 (5th Cir.1977); *United States v. Tedesco,* 441 F.Supp. 1336, 1339–40 (M.D.Pa.1977) (indictment less specific than one in instant case upheld). Consequently, our review of the sufficiency question is properly confined to considering whether the evidence supports the finding that defendants Saunders and Portsmouth Paving engaged in the "combination and conspiracy consist[ing] of an agreement, understanding and concert of action" broadly described in the indictment, not whether the appellants conspired in the particular fashion and with the precise motivations outlined in their brief.

**5.** 1A R. Callmann, *supra,* § 5.46, at 207. "A cartel is a contractual association of legally independent competitors, formed with the intent, effect or potentiality of influencing the market by means of regulating competition." 1 *id.* § 4.20, at 113 n. 31.

*States v. Bensinger Co.,* 430 F.2d 584, 589 (8th Cir.1970) (bid rigging agreement is "price-fixing agreement of the simplest kind"). As a result, we do not hesitate to conclude that the Government was not required to establish the unreasonableness of the conspiracy charged.

■ The Government was required to prove, nonetheless, that Saunders and Portsmouth Paving agreed with at least one other individual or entity to participate in the unlawful contract allocation and bid rigging charged.[6] *See South-East Coal Co. v. Consolidation Coal Co.,* 434 F.2d 767, 774 (6th Cir.1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971). The substance of the appellants' argument is that the Government's evidence failed to establish the time frame, territorial scope, and subject matter of the conspiracy alleged in the indictment. They further contend that their participation in the conspiracy charged was not proven.[7] In essence, admitting that the evidence showed the existence of a number of separate and distinct conspiracies, the appellants maintain that what the Government did prove fatally varied from the terms of the indictment. Our review of the record, however, obliges us to disagree.

At the first trial, Government witness Robert Remington testified that as manager of Sam Finley, Incorporated he was a party to a contract allocation agreement covering the cities of Norfolk, Chesapeake, Portsmouth, and Virginia Beach beginning "about late in the fall of 1963 or early in the spring of 1964." According to Remington, representatives of five companies, including Saunders of Portsmouth Paving, attended the first meeting. He testified that "[a]t the meeting we agreed to not fight, to get along, try to provide work. Everybody get their share of the work." [8] The companies ordinarily met at least annually through 1979, the frequency "depending on the volume of work that was up coming that needed to be discussed." At the second trial, Remington described the time frame of the agreement between the contractors in similar terms, affirming that Saunders attended the meetings "[f]rom the very beginning to the very end," that Saunders "was a regular attendee."

■ While several others besides Remington testified at both trials to the continuing nature of the contractors' agreement, the evidence reveals that during perhaps two intervals, totaling approximately two and one-half years, the contractors were unable to agree on the specific application of the bid rigging arrangement to the available work. Nevertheless, this evidence establishes nothing more than a temporary lull in the parties' ongoing efforts to keep competition between them to a minimum. Absent an affirmative showing of the termination of the agreement, the conspiracy must be presumed to have continued. *See*

6. There is no dispute that the business activities of the defendants, as characterized in part IV of the indictment, had a "substantial effect upon interstate commerce."

7. Citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and this court's decision in *United States v. Goss,* 329 F.2d 180 (4th Cir.1964), the appellants also assert that their trial *"en masse"* with one other corporate and four other individual defendants resulted in "spillover" of evidence prejudicial to their cause. In *Kotteakos,* however, nineteen of thirty-two indicted persons were brought to trial and "there were 'at least eight ... separate and independent groups, none of which had any connection with any other.'" 328 U.S. at 753–54, 66 S.Ct. at 1242–43. And in *Goss,* which involved ten defendants, seven of whom were convicted, the "episodes" established by the Government's proof

were "so far apart and so differently peopled as to destroy any semblance of relationship." 329 F.2d at 181, 183. Furthermore, the acquittal of two individual defendants in the case at bar is a persuasive indicator that the jury properly sorted through and distinguished the evidence applicable to each defendant.

8. At the second trial, responding to a question about what happened at the first meeting, Remington testified that

the general discussion ... was to see if we couldn't stop this competitive bidding and try and work out some asphalt in the area to everybody's advantage, and it was at the conclusion of the meeting decided that rather than keep competitively bidding against one another, we would at least get together and talk over the situation before jobs were let.

*Joyner v. United States,* 547 F.2d 1199, 1203 (4th Cir.1977); *United States v. Basey,* 613 F.2d 198, 202 (9th Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 274 (1980); *United States v. Menendez,* 612 F.2d 51, 54 (2d Cir.1979). The conspiracy initiated in 1963 or 1964 did not clearly terminate until the fall of 1979 when, according to Fred A. Haycox, president of Asphalt Roads & Materials Co., Inc., the contractors ceased meeting "[b]ecause of the investigation and some indictments."

In addition to contending that the Government's evidence failed to prove the time frame of the conspiracy charged, the appellants assert with respect to the proof of territorial scope that economic feasibility would not allow Portsmouth Paving to bid on contracts originating in Virginia Beach. Whatever responsible business practices might have demanded, however, the records of both trials affirmatively disclose that Portsmouth Paving and Saunders agreed to the allocation of contracts and the rigging of bids with companies based in Norfolk and Virginia Beach. Remington defined the agreement as covering all four cities of the Tidewater region. Likewise, Rufus Dalton, vice president of one of the Norfolk paving firms, testified that three contractors from Virginia Beach and three contractors from outside Virginia Beach, including Portsmouth Paving, had made an arrangement for the division of certain work according to territory. Elvin Ray Waterfield, associated with the Virginia Beach firm of Ashland-Warren, Inc., also described the allocation agreement as encompassing the four Tidewater cities. Haycox similarly defined the scope of the agreement.

The evidence adduced at both trials regarding the subject matter of the conspiracy was equally substantial. Our examination of the record confirms that the two above-mentioned types of paving contracts, the annual "schedule" resurfacing contracts for each city and the "nonschedule" public paving project contracts, were allocated between the conspirators. The schedule work typically was divided on an annual basis between two groups of contractors. The parties agreed that the three Virginia Beach companies were to allocate among themselves the Virginia Beach schedule work and that Portsmouth Paving and the two Norfolk-based firms were to allocate among themselves the schedule work derived from Norfolk, Chesapeake, and Portsmouth. While not all the companies expressed an interest in each nonschedule project, testimony at both trials was sufficient to support the conclusion that all the companies agreed that an effort to allocate the nonschedule projects between the interested contractors would be made whenever a nonschedule project was let for bids.

■ Government witnesses testified unequivocally that the rigged projects yielded higher prices. Additionally, discussions at meetings attended by representatives of all six companies focused on both schedule and nonschedule work. The evidence clearly allowed the jury to draw any inferences necessary to arrive at the conclusion that the arrangements concerning schedule and nonschedule work were integral parts of a "single enterprise," rather than "separate adventures of like character," *Kotteakos v. United States,* 328 U.S. 750, 769, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946), designed to effect the singular result of decreased competition in the paving industry of Virginia's Tidewater cities.

■ Finally, while we are mindful that guilt by mere association enjoys no sanction in our system of criminal law, we must reject the appellants' argument that the evidence was insufficient to prove their participation in the conspiracy. As the representative of Portsmouth Paving, Saunders regularly attended, and often organized, the contractors' secret meetings.[9] Dalton and Remington testified at both trials to Saunders' active involvement in the allocation

---

9. Undisputed testimony at both trials revealed that Saunders had "access to" an auction facility on Military Highway, one of the more frequent locations for the secret meetings of the company representatives. Indeed, at the second trial, Remington testified that he "understood [Saunders] owned part of it or he had an interest in it somewhere."

and bid rigging scheme. Saunders was present at the first meeting in 1963 or 1964 and participated through the end of the conspiracy in 1979. The evidence established his partnership in collusive commitments relating to schedule and nonschedule work. The appellants are simply too entangled in the record evidence to justify any conclusion other than that a rational trier of fact could have found guilt beyond a reasonable doubt.

## II

■ A significant portion of the testimony adduced at the second trial [10] referred to statements, discussions, understandings, and agreements of the various representatives of the conspiring companies. Under Rule 801(d)(2)(E) of the Federal Rules of Evidence, such statements attributable to the nonwitness company representatives are not excludable as hearsay if made "during the course and in furtherance of the conspiracy." This hearsay "exception" applies, however, only if a fair preponderance of independent evidence establishes the existence of and the defendants' participation in the conspiracy. *See United States v. Dockins,* 659 F.2d 15, 16 (4th Cir.1981) (substantial evidence); *United States v. Gresko,* 632 F.2d 1128, 1131 (4th Cir.1980) (sufficient evidence to take question to jury); *United States v. McCormick,* 565 F.2d 286, 289 (4th Cir.1977), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978); *Joyner v. United States,* 547 F.2d 1199, 1203 (4th Cir. 1977) (substantial evidence to demonstrate prima facie case); *United States v. Jones,* 542 F.2d 186, 203 (4th Cir.), *cert. denied* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). Nonetheless, we conclude that the district court committed no error in admitting the statements of coconspirators against Saunders and Portsmouth Paving because our review of the record convinces us of the presence of such independent evidence.

Remington testified that he "talked to Curtis [Saunders] . . . mainly to find out if

it was all right with him if I got the job." He later stated: "I went along with quite a few jobs prior to Great Neck Road, so that when my turn came, why, they were committed to me for Great Neck Road for my commitments or going along with them and putting in complementary bids on some jobs previous to that." Waterfield responded in the affirmative when asked whether he had ever met with his Tidewater competitors. He answered in the same fashion when asked whether there had "ever come a time when you spoke in coded language over the telephone to any of your competitors to exchange complementary bid prices." Waterfield also testified that Saunders was present at a meeting where Waterfield had concluded, based on a conversation between Dalton and Saunders, "that we wouldn't bid any of the asphalt work outside of the City of Virginia Beach to resurface it."

■ Haycox declared that through 1979 he attended meetings at which representatives from all six companies were present. In addition, he made specific reference to Saunders' attendance at meetings where Virginia state and Navy jobs were discussed. In response to the court's question whether "Saunders in addition to being there took part in the meetings," Haycox replied, "I'd say everybody there took part in the meeting." Dalton testified that he "talked to Curtis Saunders I guess almost every week of my life for a period of four or five years . . . I'd say from 1975 until 1980." When asked whether Saunders ever gave him "a price to bid in any city as a complementary bid," Dalton replied, "Oh, yes." He also affirmed that he gave Saunders "prices to bid on occasions, as well." Although the independent proof requirement for the admissibility of otherwise inadmissible hearsay can be extraordinarily burdensome in some conspiracy trials, the cited testimony fulfills that requirement in the instant case. Beyond that, since Saunders is a party, Rule 801(d)(2)(A) renders admissible against him all statements attributed to Saunders.

---

**10.** We are here concerned with possible error in evidentiary rulings occurring only at the second trial because the convictions being appealed did not result from the first trial.

The more complicated hearsay objection raised by the appellants stems from testimony of Remington and Waterfield concerning a telephone call purportedly made by Remington to Saunders' office. Remington was asked on direct examination about a call he made to Saunders "to get an update on [a] request" for information pertaining to another contractor's intentions on a 1975 Battlefield Boulevard job. Remington testified over counsel's objection as follows:

> Well, I called Mr. Saunders' office, and the secretary said he wasn't in. And I said, "You think you could get him on the car radio?" And she said, "Yes, I'll try." So a few minutes later she came back on the air and said, "Mr. Saunders said that the air is clear in Chesapeake."

Waterfield later testified over objection to the same incident, stating that he was standing at the doorway of Remington's office when Remington hung up the phone. According to Waterfield, "Bob Remington laid down the phone and he said 'That was Curtis Saunders' secretary and she said that the sky was clear in Chesapeake.'"

Remington's testimony involves assertions by nonwitnesses on two levels—Saunders' statement and the secretary's statement. *See* Fed.R.Evid. 801(a). Under the rationale of Rule 805,[11] before the secretary's statement may be admitted, both levels must either be excluded from the definition of hearsay or satisfy some exception to the hearsay rule. The appellants necessarily concede that the statement attributed to Saunders is admissible. A party's own statements offered against him are excluded from the definition of hearsay by Rule 801(d)(2)(A).

The admissibility of the statement attributed to the secretary depends on an analysis of the hearsay "exceptions" contained in clauses (C) and (D) of Rule 801(d)(2). Clause (C) provides that a statement offered against a party is not hearsay if it is "a statement by a person authorized by him to make a statement concerning the subject." This provision states the "orthodox" rule, and demands as a prerequisite to admissibility a showing based on evidence independent of the alleged hearsay that the declarant is an agent of the party with authority to speak on the subject. *See* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(C)[01], at 801–151–53 (1979). Ordinarily, under this rule, an employee's admissions damaging to his employer would be inadmissible on the grounds that the employee was not authorized to make damaging admissions. *See id.* ¶ 801(d)(2)(D)[01], at 801–159. Likewise, in the case at bar, while there is independent evidence of the agency status of the one with whom Remington spoke, there is no evidence, beyond that implicit in the statement sought to be admitted, that she was authorized by Saunders to make the damaging admission about the "air ... in Chesapeake."

Clause (D) broadens the narrower "orthodox" rule embodied in clause (C). Clause (D) excludes from the definition of hearsay when offered against a party a statement "by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Here, too, independent evidence establishing the existence of the agency must be adduced, but specific authorization to speak need not be shown. That the statement is made within the scope of the agency is sufficient. The issue, then, is whether the record contains independent evidence demonstrating that the woman with whom Remington spoke was an agent of Saunders speaking about a matter within the scope of her employment.[12] We conclude that the record does contain such evidence.

---

11. Rule 805 provides:

> Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.

12. The evidence necessary to establish the existence and scope of the agency relationship must be independent of the statement attributed to the agent. In other words, to avoid bootstrapping, agency must be demonstrated without the help of the statement sought to be

First, Remington testified that he "called Mr. Saunders' office." Not only does this testimony authenticate the occurrence of the telephone call in accordance with the standard illustrated by Rule 901(b)(6),[13] but the testimony also supports the inference that the one who answered the telephone was Saunders' agent. One would usually and properly assume upon the dialing of a business office phone number that the person who answers is employed by and has the authority to speak for the business.

Second, Remington testified that "the secretary" answered the call. That a businessman's secretary is an agent of the businessman for purposes of relaying messages to and from the businessman is common knowledge. Notwithstanding other testimony that casts some doubt on the accuracy of Remington's characterization of the answerer as a secretary, his description of the one with whom he spoke constitutes a portion of the necessary independent evidence.

Finally, the two female employees in Saunders' office in 1975, the year that Remington made his call, testified that they occasionally answered the telephone and by radio relayed messages to and from Saunders.[14] This testimony, in conjunction with that previously identified, virtually compels the conclusion that the woman to whom Remington spoke was an agent of Saunders with the authority to relay messages from Saunders to those who called his business office. Under the terms of Rule 801(d)(2)(D), the statement attributed to the woman, which was a simple declaration of what Saunders had said, concerned "a matter" within the scope of her employment because part of her job entailed relaying messages from Saunders to business callers. That the woman's statement was "made during the existence of the [agency] relationship" is an obvious corollary. Because the record contains the essential independent evidence of agency, the trial court did not err in admitting Remington's account of the telephone conversation.

■ Waterfield's testimony about the Remington telephone call presents hearsay implications on a third level. To paraphrase Waterfield, "Remington said that the secretary said that Saunders said ..."[15] In this additional testimony of Waterfield, for purposes of further hearsay analysis, Remington is the declarant. *See* Fed.R.Evid. 801(b). While the appellants contest the Government's argument that Remington's statement is admissible under Rule 801(d)(2)(E) as that of a coconspirator of Saunders, a decision on that question is

admitted. *Cf. United States v. Dockins,* 659 F.2d 15, 16 (4th Cir.1981) (admissibility under 801(d)(2)(E) conditioned on evidence of conspiracy "other than the statement itself"); *Joyner v. United States,* 547 F.2d 1199, 1203 (4th Cir.1977) (coconspirator rule requires evidence of conspiracy "other than the statements in question") Thus, the secretary's quotation of Saunders may not be used to prove her status as Saunders' agent. That is not to say, however, that Remington's description of the telephone call, except for the secretary's words, may not qualify as the requisite independent evidence.

13. Rule 901(b)(6) provides that for purposes of admissibility telephone conversations may be authenticated
> by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if ... (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

The Advisory Committee's Note explains that "[i]f the number is that of a place of business, the mass of authority allows an ensuing conversation if it relates to business reasonably transacted over the telephone, on the theory that the maintenance of the telephone connection is an invitation to do business without further identification."
*See United States v. Espinoza,* 641 F.2d 153, 170–71 (4th Cir.), *cert. denied,* 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981).

14. While one of the employees flatly denied ever having relayed the statement attributed to Saunders, the other only stated that she did not remember doing so.

15. On cross-examination, Waterfield stated, "[Remington] told me that was Curtis' secretary and said she had talked with Curtis on the radio, two-way communications, and he stated that she stated that he said 'The sky is clear in Chesapeake.'"

not necessary.[16] Waterfield's testimony clearly falls within the hearsay exception delineated by Rule 803(1).

Regardless whether the declarant is available as a witness, Rule 803(1) provides that the hearsay rule does not exclude "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Three requirements must be satisfied before this exception may be applied. The requirements pertain to subject matter, perception, and time. See 4 J. Weinstein & M. Berger, supra, ¶ 803(1)[01], at 803–72–77. The subject matter of Remington's statement, the "event or condition" that he "describ[ed] or explain[ed]," was the completed telephone conversation with Saunders' office. A telephone call is certainly "an event," and in this case, in speaking to Waterfield, Remington clearly was describing and explaining the event of that telephone call.

Similarly, that the declarant "perceiv[ed]" the event is beyond dispute. Waterfield directly testified that he observed Remington hang up the telephone. We perceive events with our ears as much as with our eyes and, in the ordinary course of events, one hangs up a telephone at the end of a telephone conversation, after having "perceiv[ed]" the words of the other party.[17]

Finally, Remington's statement falls squarely within the time strictures of Rule 803(1), having occurred "immediately" after the telephone call. Within a matter of no more than a few seconds, Remington "laid down the phone" and described the conversation to Waterfield. While Waterfield admittedly lacked the opportunity also to hear the conversation, the contemporaneity of the call and the explanation eliminated any possibility that Remington's memory would render his explanation inaccurate and greatly reduced any likelihood of fabrication. This additional level of hearsay, therefore, fulfills the requirements of Rule 803(1). Consequently, as the Rules of Evidence render admissible each component of Waterfield's testimony, the trial court did not err in overruling the appellants' objection to its admission.

## III

Saunders and Portsmouth Paving also complain of the district court's refusal to allow testimony from an expert witness proffered to suggest an innocent explanation for the bidding patterns in the Tidewater region during the course of the conspiracy alleged. Their expert, a "consulting economist," purportedly could have raised a reasonable doubt about the appellants' part in the conspiracy by demonstrating that the bidding of Portsmouth Paving reflected the realities of market areas and the company's capacity to compete.

Rule 702 of the Federal Rules of Evidence does provide for the admission of expert testimony when the expert's "knowledge will assist the trier of fact ... to determine a fact in issue." Rule 702, however, does not require the admission of all proffered expert testimony; the district judge has broad discretion to decide whether such testimony ought to be admitted as helpful to the jury. See Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); United States v. Vik, 655 F.2d 878, 880 (8th Cir. 1981); United States v. Lopez, 543 F.2d 1156, 1158 (5th Cir.1976), cert. denied, 429

---

**16.** The record leaves no doubt that Remington was a coconspirator of Saunders. That Remington was not named in the indictment is unimportant for purposes of Rule 801(d)(2)(E). See United States v. Salisbury, 662 F.2d 738, 740 (11th Cir.1981); United States v. Truong Dinh Hung, 629 F.2d 908, 930 (4th Cir.1980), cert. denied, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982); Joyner v. United States, 547 F.2d 1199, 1202 & n. 7 (4th Cir.1977). Whether Remington's statement to his subordi-nate, Waterfield, was "in furtherance of the conspiracy" is the only question we do not decide.

**17.** We note, too, that declarant Remington was not an "unidentified bystander." Since Remington is identified, "his capacity to observe can [either] be substantiated [or] attacked." 4 J. Weinstein & M. Berger, supra, ¶ 803(1)[01], at 803–74.

U.S. 1111, 97 S.Ct. 1150, 51 L.Ed.2d 566 (1977); *Krizak v. W.C. Brooks & Sons, Inc.,* 320 F.2d 37, 42 (4th Cir.1963). This discretion is implicit in Rule 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We conclude that the district judge did not abuse his discretion.

In effect, the proffered testimony of the appellants' expert did little more than correlate higher contracting costs with longer hauling distances. As summarized by the trial court, "the testimony of the expert boils down to, in very simple phrases, that you have a competitive advantage if you're nearer home and that how far you want to go from your home base depends upon your willingness or the necessity to shave profits." The court reasoned that the appellants' expert had nothing to add to what other witnesses had already stated. We are persuaded that lay jurors were fully able to understand and appreciate the implications of the evidence admitted. Instead of assisting the jury in determining a factual issue, the proffered testimony at least amounted to unnecessary, cumulative evidence and might well have confused or misled the jury had the evidence been admitted.

## IV

On a number of grounds, the appellants argue that the trial court committed reversible error in instructing the jury. We are not persuaded. Two contentions, however, deserve further comment.

First, according to Saunders and Portsmouth Paving, the court should have instructed the jury that the Government was required to prove that an overt act in furtherance of the conspiracy occurred within the five-year statute of limitations period set out by 18 U.S.C. section 3282. The proposed instruction, however, is an inaccurate statement of the law. Section 1 of the Sherman Act proscribes agreement alone, and no overt act to further the agreement need be shown. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 252, 60 S.Ct. 811, 857, 84 L.Ed. 1129 (1940); *United States v. United States Gypsum Co.,* 600 F.2d 414, 417–18 (3d Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979); *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977). Likewise, while the Government must prove beyond a reasonable doubt that the offending agreement continued into the five-year limitations period, the Government is not required to prove a new agreement. 600 F.2d at 418.

As the Third Circuit has held, "[w]hen the conspiracy is alleged to have been formed prior to the statutory period, the issue becomes one of continuation." *Id.* at 417. The evidence of that continuation may relate to something other than an overt act. To hold otherwise would produce the anomalous result of making a conviction for participation in a long-established antitrust conspiracy more difficult to procure than one based on a conspiracy conceived within five years of the date of the indictment. In the case at bar, the district court correctly instructed the jury simply that the offense charged "requires the government to prove beyond a reasonable doubt that the conspiracy existed some time during the period November 25, 1975, to November 25, 1980, and that the defendant be a member of the conspiracy during that period."

Second, the appellants maintain that since the indictment alleged a per se violation of the Sherman Act, the trial court's instruction describing the conspiracy charged as one that "restrained free competitive bidding" failed adequately to restrict the jury's consideration of anticompetitive practices to those included in the indictment—bid rigging and contract allocation. While we are not persuaded that the questioned instruction is faulty, all doubt is removed when the charge to the jury is considered as a whole. *See United States v. Park,* 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975). In addition to the complained of instruction, the court instructed the jury that a conspiracy

to allocate surface paving contracts and to submit rigged bids in connection with such contracts . . . is the only conspiracy with which the defendants are charged, and, if you do not believe that the evidence has established beyond a reasonable doubt the existence of this conspiracy, you must find the defendants innocent.

▇ Saunders and Portsmouth Paving further assert that the trial court's failure to provide a definition of bid rigging was reversible error. We agree with the Government, however, that the instruction proffered by the defendants, which included in its definition of bid rigging a requirement that coconspirators agree to reciprocate by submitting complementary bids on future projects, is an erroneous statement of the law. Any agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party constitutes bid rigging per se violative of 15 U.S.C. section 1.[18] *See United States v. David E. Thompson, Inc.,* 621 F.2d 1147, 1149–50 (1st Cir.1980); *United States v. Brighton Building & Maintenance Co.,* 598 F.2d 1101, 1103, 1106 (7th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977). In the instant case, the district court's instructions satisfactorily elucidated the nature of bid rigging and the particular conspiracy for which Saunders and Portsmouth Paving were charged.

We have carefully considered the appellants' remaining arguments and find them to be without merit. Accordingly, for the reasons stated, the judgments of conviction are affirmed.

AFFIRMED.

WIDENER, Circuit Judge, dissenting:

While I agree with the balance of the opinion of the majority, I respectfully dissent from the result and from part III of its opinion in which it affirms the district court's holding that the testimony of the defendants' expert witness was inadmissible.

The witness in question was David Parcell, an independent consulting economist. His qualifications were beyond reproach. He was a graduate of VPI with a master's degree in economics, had written several articles for learned journals, and on more than a hundred occasions had been called upon to define market areas. The market area and an analysis of the bids of Portsmouth Paving would have been the subject of his testimony. There was no more relevant evidence in the case.

Parcell had analyzed each bid in question which Portsmouth Paving had made, and, in consideration of variable and fixed costs, had formed an opinion on whether the bids were within the market area of Portsmouth Paving. Parcell defined market area as the area in which Portsmouth Paving had a cost advantage and in which it would be expected to be the successful bidder the vast majority of the time. He would have testified that Portsmouth Paving made the vast majority of its bids within its market area.

The theory of the government's case was that the alleged conspirators had refrained from bidding in some instances to lessen competition and had made complimentary bids in other instances to feign competition. The refraining from bidding on the one hand and complimentary bidding on the other, the government contends, was pursuant to an agreement to rig the paving bids in the area involved which consisted generally of the Norfolk, Virginia Beach, Portsmouth, Hampton Roads tidewater area of Virginia.

As noted, the testimony of Parcell would have tended to show that the vast majority of the bids of Portsmouth Paving were within its market area, which he would have defined, and that they were justified by economic considerations in all events. Thus, if the jury had believed his testimony, it could have concluded that the bids, sub-

---

**18.** Callmann explains that collusive bidding is "an agreement between competitors in a bidding contest to submit identical bids or, by preselecting the lowest bidder, to abstain from all bona fide effort to obtain the contract." 1 R. Callmann, *supra,* § 4.34, at 203.

mitted or which Portsmouth Paving refrained from submitting, were due to legitimate economic considerations and not pursuant to an agreement entered into in violation of the Sherman Act. At the very least, the jury could have given Parcell's testimony sufficient weight so that it believed the government's case was not proven beyond a reasonable doubt.

The district court refused to admit the testimony of Parcell for the stated reason that " . . . it seems to me that the testimony of the expert boils down to, in very simple phrases, that you have a competitive advantage if you are near home and that how far you want to go from your home base depends upon your willingness or necessity to shave profits." The court gave as a further reason that lay witnesses had described the natural trading area of Portsmouth Paving and the expert testimony did not add to it.

I agree that the admissibility of expert testimony is a matter within the discretion of the trial court and that its discretion should not be disturbed on appeal unless it is manifestly erroneous. See *Salem v. United States Lines,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). I believe, however, that the action of the trial court complained of in this case was manifestly erroneous. We are dealing here with FRE 702 which provides for the admissibility of expert testimony when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." It is enough that the evidence would assist the trier of fact. *United States v. Hill,* 655 F.2d 512, 516 (3d Cir.1981); *United States v. Scavo,* 593 F.2d 837, 844 (8th Cir.1979). Weinstein notes that "[e]ven when jurors are well equipped to make judgments on the basis of their common knowledge and experience, experts may have specialized knowledge to bear on the same issue which would be helpful." 3 *Weinstein on Evidence* ¶ 702[02] at 702–10. The text further states that "[b]ecause of the Federal Rules emphasis on liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclu-

sions. The jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations." *Weinstein* at 702–14–15. And Wigmore states the proposition in these words: "But the only true criterion is: On *this subject* can a jury receive from *this person* appreciable help?" (Italics are Wigmore's.) 7 Wigmore *Evidence* ¶ 1923 at p. 29.

With these thoughts in mind, Parcell's proffered testimony, that of an acknowledged expert, which would have compared the economical bidding area of Portsmouth Paving with those of the other paving contractors involved in the conspiracy, was testimony which could only have aided the jury in its consideration. It went to the heart of the very question at hand: Were the defendants' actions the result of an agreement in violation of the Sherman Act, or were they the result of everyday economic factors faced by every contractor who bids on any job anywhere?

I do not contend that the jury necessarily could not comprehend the basic concept that costs increase the further a paving contractor must travel to perform a job. But how far he may travel and do the job economically is a matter in which expert opinion certainly is helpful, even if not necessary. Indeed a strong argument can be made that it is necessary. The old saw in the contracting business that one who makes low bids on all jobs soon goes broke is not without foundation. So the cost factors involved in Portsmouth's bidding about which Parcell would have testified were most relevant to the question at hand. Portsmouth was left with its naked denial, supported, it is true, by the testimony of its employees and officers. But it was entitled, I think, to corroborate their testimony which was bound to be considered in the light of their respective positions. The court, for example, properly and explicitly charged the jury to "[c]onsider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict . . . ."

By depriving the defendants of the testimony of Parcell, the court deprived them of valuable corroborating evidence by an independent expert. It thus prevented them from presenting their side of the case.

A decision with similar facts, and with the same issue, as the case at hand is *Continental Baking Company v. United States,* 281 F.2d 137 (6th Cir.1960). In that case the defendants were charged with criminal antitrust violations, that of the fixing of prices on bakery products in the Memphis, Tennessee area. The government's proof tended to show that the prices charged by the defendants were the same and that preceding each price increase the defendants met and discussed prices. The defense was that the price increases were not the result of any agreement but were merely the result of economically dictated conscious parallelism. Thus, the issue in the case was whether the similar prices were the result of an agreement in violation of the Sherman Act or whether they were the result of economic factors which would not have been a crime, precisely the same issue which is presented in this case. The defendants offered expert testimony as to the economic considerations which brought about the pricing which the court excluded, reversing a previous ruling on the question, because it considered the evidence offered as tending to justify a price fixing agreement which was per se illegal. The court of appeals reversed the conviction, stating that "the supplementary economic evidence offered by defendants can be considered only in relation to their defenses, *that the price changes were not the result of any agreements."* p. 146. (Italics added.) The defense here is the same, that the bidding of Portsmouth Paving was not the result of any agreement.

One further thing deserves mention. The first trial ended in a hung jury. At that trial, Parcell was permitted to testify. When the retrial came around, the same witness was not permitted to give the same evidence which the same court had held admissible in the first trial. I submit the action of the district court was correct in the first instance and erroneous in the

second. By its actions it deprived the defendants of the only corroborating independent evidence they had.

I would grant a new trial.