**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                   No. 97-4420

DONTE JAVON PITT,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CR-96-36-AW)

Argued: December 4, 1998

Decided: January 22, 1999

Before HAMILTON and LUTTIG, Circuit Judges, and
MICHAEL, Senior United States District Judge
for the Western District of Virginia,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Kenneth Michael Robinson, William Jackson Garber,
Washington, D.C., for Appellant. Odessa Palmer Jackson, Assistant
United States Attorney, Greenbelt, Maryland, for Appellee. **ON
BRIEFS:** Dennis M. Hart, Washington, D.C., for Appellant. Lynne
A. Battaglia, United States Attorney, Stephen S. Zimmerman, Assis-
tant United States Attorney, Greenbelt, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Donte Pitt challenges his conviction for conspiracy to distribute and possess with intent to distribute cocaine and for related offenses. We affirm.

I.

On the evening of March 25, 1995, Corporal Milton Crump and two other officers from the Prince George's County Police Department responded to a burglar alarm at a house in Temple Hills, Maryland. Upon arriving at the scene, the officers detected the smell of natural gas. Crump reported the smell to his supervisor, who called the local fire department. Members of the fire department confirmed the smell of natural gas and turned off the gas supply to the house. Having obtained no response after knocking on the front door, the firefighters broke down the door. The police officers then entered the house to search for a burglar or for any occupants of the house in need of assistance. Upon entering the house, the officers observed a white powdery substance and several crystallized rocks that appeared to be crack cocaine. The officers also saw a gun, an electronic scale, and several boxes of baking soda, which is used in the production of crack cocaine.

Having determined that there was no one in the house, Crump relayed the results of the search to his supervisor, who asked that a narcotics officer be sent to the scene. In the meantime, the officers secured the premises. Approximately 15 to 20 minutes later, Detective Richard Herbert, a narcotics expert, arrived. Crump escorted Herbert into the house, where he pointed out the items he had seen. Herbert then performed a field test on the white powdery substance that the officers had observed, and determined that the substance was cocaine. On the basis of the information obtained by the officers, Her-

2

bert sought and procured a search warrant for the house. Officers executed the warrant that night and discovered approximately 500 grams of cocaine, paper wrappers and plastic bags, a number of boxes of baking soda, two semi-automatic handguns, approximately $2,000 in currency, and a safe. Three days later, officers executed a further search warrant on the safe and found approximately two kilograms of cocaine, three more semi-automatic handguns, and approximately $300,000 in currency. The house was leased in the name of "Robert Watson"; however, extensive fingerprint and handwriting evidence linked Donte Pitt to the property. In addition, police connected evidence seized from an apartment elsewhere in Temple Hills, including a further amount of cocaine, with Pitt.

On February 5, 1996, Pitt was indicted on two counts of possession with intent to distribute cocaine and possession of a firearm by a convicted felon. On March 25, Pitt was charged, in a superseding indictment, with five further counts of conspiracy to distribute and possess with intent to distribute cocaine, distribution of cocaine, and use of a firearm during a drug trafficking offense. Pitt entered a plea of not guilty.

Pitt's trial began on October 15. As its first witness, the prosecution called Richard Herbert, the narcotics detective who conducted the search of the house. On cross-examination, defense counsel asked Herbert about a photograph given to him and another officer by David Hughes, the rental agent for the house that Herbert searched. Herbert testified that Hughes had said that the photograph was of the person who had rented the house and that the last name of the person was Allen. Defense counsel contended that the photograph was of Norman Allen, whom they claimed was actually the "Robert Watson" whose name appeared on the lease of the house. On re-direct examination, the government sought to introduce testimony by Herbert that Hughes told the agents that Pitt had given him the photograph and had identified the person in the photograph as Allen. The trial judge admitted the evidence on the ground that it was being offered not for the truth of the matter asserted, but rather to rebut the implication that the officers erred by focusing their investigation on Pitt, rather than on Allen. Defense counsel then indicated their intention to introduce an affidavit signed by Hughes, but they appear never to have actually attempted to do so.

3

The prosecution subsequently called Richard Eisenbarth, whom the prosecution claimed had engaged in a guns-for-drugs trade with a man named Daniel Brown. Eisenbarth testified that Brown told him that he was acting on behalf of an individual named"Don" -- allegedly Donte Pitt. Defense counsel objected to Eisenbarth's testimony. The trial judge admitted the testimony, however, on the ground that it was a statement made by a co-conspirator of the defendant. Defense counsel subsequently sought to introduce a deposition of Brown taken by defense counsel prior to trial. The trial judge, however, excluded this testimony on the grounds that Brown was available to testify in person and that the deposition testimony conflicted with Brown's earlier testimony before the grand jury and therefore was unreliable.

In the course of presenting its case, the defense sought to call Michael Bell, who had been charged, along with Pitt, with participation in a drug conspiracy in 1990. Defense counsel wanted to call Bell in order to rebut evidence introduced by the prosecution that Pitt had spent hundreds of thousands of dollars on cars, travel, and jewelry during the course of the conspiracy at issue in the instant case. Defense counsel contended that Bell would testify that Pitt had made a substantial amount of money as a result of the 1990 conspiracy, which he then used to fund his spending at the time of the subsequent conspiracy. The trial judge, however, excluded Bell's testimony on the grounds that it would have minimal probative value and that it would also be cumulative, confusing, and prejudicial.

On October 30, after the close of the prosecution's case-in-chief, the foreman of the jury, Juror No. 1, informed the trial judge that Juror No. 8 had made improper comments in front of other jurors regarding whether the prosecution had proven its case. Upon being summoned to the courtroom, Juror No. 8 admitted that she had said something like, "I haven't seen any proof yet." However, she also asserted that she remained "open-minded." On the way out of the courtroom, Juror No. 8 asked the courtroom clerk if the clerk could get her "off this case," and said that she lived close to the area in which the events at issue occurred. The clerk then relayed these statements to the trial judge. On the basis of Juror No. 8's original statement to her fellow jurors and her later statements to the deputy clerk, the trial judge dismissed her and replaced her with an alternate juror.

4

The trial concluded on Friday, November 1. The trial permitted the jury to return home for the weekend before beginning deliberations the following Monday. When the jury returned on Monday, jurors reported to the trial judge a number of incidents that had occurred over the weekend. Juror No. 2 reported that an individual had visited his job site and inquired about his jury service; Juror No. 3 reported that she had received a telephone call at 1 a.m. from a woman who said, "B----, watch your back"; and Juror No. 12 reported that she had been followed to the grocery store by a man with long, stringy hair and a mustache, who resembled a police officer who had been watching the trial. Upon receiving these reports, the trial judge spoke ex parte with each of the jurors who reported the incidents and then questioned all of the jurors individually in the courtroom about the reported incidents. Although a number of jurors expressed concern about the incidents, and some alluded to other incidents, none said that he or she was scared as a result of them, and all of the jurors said that they would continue to be fair and impartial. During and after the poll of the jury, defense counsel moved for a mistrial. The trial judge denied the motions.

Later that afternoon, the jury found Pitt guilty on all counts. On May 28, 1997, the district court sentenced Pitt to 300 months in prison. Pitt now appeals.

II.

Appellant first contends that the district court should have suppressed the evidence seized as a result of the execution of search warrants against the house in Temple Hills.

As a threshold matter, the initial entry of the house, by Corporal Milton Crump and other police officers, was clearly justified by exigent circumstances, for the purposes both of determining if a burglar was inside and of rescuing any individuals inside from the suspected gas leak.[1] See, e.g., Minnesota v. Olson, 495 U.S. 91, 100 (1990)

_____

[1] At trial, appellant did argue that there were no exigent circumstances at the time of the initial entry on the ground that firefighters entered the house before any of the police officers did, thus dissipating any exi-

5

(holding that warrantless entry is justified by "the need to prevent a suspect's escape, or the risk of danger to the police or to the other persons inside or outside the dwelling" (internal quotation omitted)); Mincey v. Arizona, 437 U.S. 385, 392 (1978) (holding that warrantless entry is justified when police officers "reasonably believe that a person within is in need of immediate aid"). Further, as appellant appears to concede, once Crump and the other officers were inside the house, they could have seized any contraband they saw in plain view. See, e.g., id.; Michigan v. Tyler, 436 U.S. 499, 509 (1978); Coolidge v. New Hampshire, 403 U.S. 443, 465-66 (1971) (plurality opinion).

Appellant contends, however, that the subsequent warrantless entry by Crump and Detective Richard Herbert was unconstitutional because any exigent circumstances present at the time of the original entry had dissipated. We disagree on the ground that the second entry was "no more than an actual continuation of the first." Tyler, 436 U.S. at 511. In entering the house, Crump and Herbert were not conducting any further search: instead, as the district court found, Herbert was simply verifying what Crump, a junior officer, had seen in the course of his search minutes earlier, in order to aid in preparing an application for a search warrant. J.A. at 201. The only additional step that Crump and Herbert took was to conduct a field test of the suspected cocaine: however, Crump could easily have conducted such a test himself during the original entry, or, in the alternative, could have seized the suspected cocaine, removed it from the house, and tested it there.

Even were we to conclude that the subsequent warrantless entry was unconstitutional, we would nevertheless rule that the evidence seized pursuant to the search warrants was admissible. Appellant contends that the evidence was inadmissible under the "fruit of the poi-

_____

gency. However, in support of this theory, appellant could introduce only the testimony of a witness, Bethel Hunley, who was "not sure" as to whether the firefighters or police officers entered the house first. J.A. at 197. Crump, on the other hand, testified that the police officers entered the house first. Id. at 164a. To the extent that appellant raises the issue on appeal, we find that the district court properly credited Crump's testimony over Hunley's. Id. at 197.

6

sonous tree" doctrine. See, e.g., Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). Even on the basis of only the evidence discovered in plain view during the original warrantless entry, however, the officers would easily have been able to obtain a warrant. See, e.g., United States v. Walton, 56 F.3d 551, 554 (4th Cir. 1995) (holding that affidavit submitted in support of application for search warrant stated probable cause even without information obtained through unlawful entry); United States v. Gillenwaters, 890 F.2d 679, 681-82 (4th Cir. 1989) (same); see generally Franks v. Delaware, 438 U.S. 154, 171-72 (1978) (examining affidavit submitted in support of application for search warrant for probable cause after discounting false statement). The original warrantless entry therefore constituted an "independent source" for the evidence used to obtain the warrant. See, e.g., Murray v. United States, 487 U.S. 533, 537 (1988); Segura v. United States, 468 U.S. 796, 813-16 (1984); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920). Because the officers would have been able to obtain a warrant even without the second warrantless entry, and because the second warrantless entry was constitutional in any event, we conclude that the district court correctly denied appellant's motion to suppress.

III.

Appellant next challenges the district court's decisions regarding the admission of certain evidence under the hearsay rules. We consider each of appellant's arguments in turn.

First, appellant challenges the district court's decision to admit the testimony of Detective Richard Herbert that David Hughes, the lessor of the Temple Hills house, told him that appellant had given him the photograph of the person who purportedly leased the house, and had identified the person in the photograph as Allen. Appellant contends that this testimony was hearsay. Appellant's contention fails, however, because this testimony was not offered into evidence in order to prove the truth of the matter asserted. See Fed. R. Evid. 801(c). Instead, as the district court correctly noted, the prosecution offered Herbert's testimony, which indicated that appellant had given Hughes the photograph, in order to rebut the implication that, because the investigating officers had a photograph suggesting that Norman Allen was the lessee of the Temple Hills house, the officers erred by focus-

7

ing their investigation on appellant, rather than on Allen. Indeed, by questioning the motives of the officers in investigating appellant, defense counsel opened the door to such rebuttal evidence. We thus conclude that the district court properly admitted Herbert's testimony.[2]

Second, appellant argues that the district court should have admitted the affidavit signed by Hughes and produced by defense counsel. As a threshold matter, although defense counsel repeatedly asserted its intention to introduce the affidavit, they appear never to have actually attempted to do so. Even if they had, however, the affidavit would not have been admissible. See Fed. R. Evid. 804(b)(5).[3] First, defense counsel failed to make known their intention to offer the affidavit, and the particulars of the affidavit, "sufficiently in advance of the trial or hearing," as is required by Rule 804(b)(5). Although defense counsel made the affidavit available to the court in camera in advance of the trial, the prosecution learned of the affidavit, and obtained a copy of it, only once the trial was underway. Second, Hughes' affidavit lacks "circumstantial guarantees of trustworthiness," as is also required by Rule 804(b)(5). In determining whether a statement has sufficient guarantees of trustworthiness, we examine the totality of circumstances surrounding the making of the statement. See United States v. McHan, 101 F.3d 1027, 1038 (4th Cir. 1996). In view of Hughes' prior relationship with appellant, the mysterious circumstances in which the affidavit was delivered to defense counsel, and Hughes' decision to leave the country during appellant's trial, Hughes' affidavit lacks any such guarantees. Because Hughes' affidavit does not fall into any of the other hearsay exceptions, and does not meet the requirements of the catch-all provision in Rule 804(b)(5), we conclude that, if it had been offered into evidence, it would have been inadmissible.[4]

_____

[2] Appellant contends that he was entitled to a limiting instruction that the testimony was not offered to prove the truth of the matter asserted. Defense counsel, however, failed to seek such a limiting instruction.
[3] Since appellant's trial, Rule 804(b)(5) has been recodified as Rule 807. For purposes of this appeal, however, the relevant text is identical.
[4] Appellant contends, in the alternative, that Hughes' affidavit could have been admitted under Rule 806. See Fed. R. Evid. 806. However, this contention also fails on the ground that, notwithstanding the fact that

8

Third, appellant challenges the district court's decision to admit the testimony of Richard Eisenbarth regarding Daniel Brown's identification of "Don" as the individual on whose behalf he was engaging in a guns-for-drugs trade. Specifically, appellant contends that there was no evidence, other than Brown's alleged statement, that Brown was a co-conspirator for purposes of invoking the co-conspirator exception to the hearsay rules. See Fed. R. Evid. 801(d)(2)(E). Admittedly, Brown was not a named co-conspirator in any of the conspiracy charges against appellant: however, the statement of an unnamed co-conspirator can still be admitted under Rule 801(d)(2)(E). See United States v. Portsmouth Paving Corp., 694 F.2d 312, 323 n.16 (4th Cir. 1982). In order to invoke the co-conspirator exception, it is not necessary for the prosecution to demonstrate either that the declarant was unavailable to testify at trial or that declarant's statement was reliable. Instead, the prosecution need only show, by a preponderance of the evidence, that the declarant was a co-conspirator and that the declarant's statement was made in the course of and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 176 (1987). Contrary to appellant's assertion, we find that ample evidence in the record establishes Brown as a co-conspirator of appellant.[5] First, the guns that were obtained in the guns-for-drugs trade were demonstrated to be the same guns recovered from the Temple Hills house, which was linked to appellant. Second, Brown leased several vehicles in his own name on behalf of appellant, apparently including a green van that he used during the guns-for-drugs trade with Eisenbarth. In

_____

appellant never actually tried to introduce the affidavit, appellant could not have introduced the affidavit to attack the credibility of the declarant in a previously admitted hearsay statement because Herbert's testimony was not hearsay. See supra at 7-8. Even assuming that Herbert's testimony could be construed as hearsay because of the lack of a limiting instruction, despite defense counsel's failure to request one, Hughes' affidavit still could not have been introduced to attack his credibility because the affidavit does not even mention the photograph that was the subject of the alleged hearsay.

[5] Appellant claims that Brown was not a co-conspirator because he stood in a mere buyer-seller relationship with Eisenbarth. For purposes of Rule 801(d)(2)(E), however, the relevant inquiry is into the relationship between the declarant and the defendant, not the declarant and the witness testifying to the declarant's statement.

9

view of this evidence, we agree with the district court that Eisenbarth's testimony was admissible under the co-conspirator exception.**6**

Finally, appellant argues that the district court should have admitted the transcript of Brown's deposition. At trial, appellant sought to introduce the transcript, like the Hughes affidavit, under Rule 804(b)(5). As with the Hughes affidavit, however, the district court found, and we agree, that the transcript of the Brown deposition lacked sufficient guarantees of trustworthiness to be admissible under Rule 804(b)(5). Specifically, the deposition testimony directly contradicted previous statements made by Brown both to police officers and before the grand jury.**7** In the alternative, appellant now contends that the transcript should have been admissible for the purpose of impeaching the credibility of the statement of Brown reported by Eisenbarth and admitted under the co-conspirator exception. See Fed. R. Evid. 806. Assuming arguendo that the transcript was admissible for this purpose under Rule 806, we conclude that any failure to admit it was harmless. If the transcript were admissible, Brown's contradictory grand jury testimony, which the district court had also kept out under Rule 804 as unreliable, would also have been admissible in order to support Brown's credibility. See id. In light of the overwhelming other evidence of defendant's guilt, and the minimal probative value of the transcript in light of the conflicting grand jury

---

**6** At trial, appellant noted that Eisenbarth's testimony involved a statement allegedly made by Brown on December 26, 1994, whereas the indictment against appellant charged that the conspiracy began only "on or about January 1995." J.A. at 16. Appellant therefore contended that the testimony, even if not hearsay, would not be admissible because it involved uncharged conduct occurring prior to the start of the charged conspiracy. See Fed. R. Evid. 404(b). Even assuming that December 26, 1994, cannot be said to be "on or about January 1995," appellant's argument fails because the guns-for-drugs trade was not consummated until March 9, 1995. In any event, a district court has discretion to admit evidence of uncharged conduct if it arose out of the same series of transactions as the charged offense or if it is necessary to complete the story of a crime. See United States v. Kennedy , 32 F.3d 876, 885 (4th Cir. 1994).
**7** In addition, although defense counsel made the Brown deposition transcript, like the Hughes affidavit, available to the court in camera in advance of the trial, the prosecution learned of the deposition, and obtained a copy of the transcript, only once the trial was underway.

10

testimony, the district court's decision not to admit the transcript, even if erroneous, was harmless. We therefore reject appellant's claim.

IV.

Appellant next asserts that the district court abused its discretion by refusing to permit him to call Michael Bell in order to testify that he had made a substantial amount of money as a result of a previously charged conspiracy. We disagree.

The district court based its refusal to allow Bell to testify on Rule 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. As the district court correctly noted, Bell's testimony was excludable under Rule 403 on several grounds. First, Bell's testimony would have had only minimal, if any, probative value: although appellant claims Bell's testimony was necessary to rebut the government's implication that his lavish spending was a direct result of his involvement in the conspiracy charged in the present case, the mere fact that appellant made a substantial amount of money from an earlier drug conspiracy hardly demonstrated that he possessed a "cash hoard" at the time of the charged conspiracy nearly five years later. Second, Bell's testimony would have been cumulative, since evidence of appellant's earlier charge had already been introduced. Third, Bell's testimony could have been confusing to the jury. Fourth, Bell's testimony could have been prejudicial to appellant's own case: because of Bell's testimony that appellant played a major role in an earlier drug conspiracy, the jurors could easily have concluded that appellant was likely to have played a major role in the charged conspiracy as well. For all of these reasons, we conclude that the district court did not abuse its discretion by excluding Bell's testimony.

11

V.

Appellant next contends that the trial judge improperly dismissed Juror No. 8 and replaced her with an alternate juror. We disagree.

A trial judge may replace jurors with alternate jurors whenever they, "prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Fed. R. Crim. P. 24(c). A trial judge's decision to substitute an alternate juror is reviewed for abuse of discretion. See , e.g., United States v. Nelson, 102 F.3d 1344, 1349 (4th Cir. 1996).

We conclude that the trial judge in this case did not abuse his discretion because he had two legitimate bases for dismissing Juror No. 8. First, Juror No. 8 admitted she had made a comment regarding whether the prosecution had proven its case, in contravention of the trial judge's specific instructions. Failure to abide by a trial judge's instructions is in itself a sufficient basis for removal. See, e.g., United States v. Vega, 72 F.3d 507, 512 (7th Cir. 1995). In addition, Juror No. 8 told the courtroom clerk that she wanted to get "off this case." At least under the circumstances here, this comment likewise constitutes a sufficient basis for removal.

Appellant contends that Juror No. 8 should not have been dismissed because of her assurances to the trial judge that she remained "open-minded" about the case. A juror's representations regarding his or her ability to perform fairly and impartially, however, are not dispositive. See Murphy v. Florida, 421 U.S. 794, 800 (1975). Instead, it is the responsibility of the trial judge to make his or her own determination as to a juror's ability to remain fair and impartial. See, e.g., United States v. Barone, 114 F.3d 1284, 1307 (1st Cir.), cert. denied, 118 S. Ct. 614 (1997). In view of Juror No. 8's comments to her fellow jurors and to the courtroom clerk, we conclude that the trial judge did not abuse his discretion by discounting Juror No. 8's own representations about her ability to continue as a juror. We therefore reject appellant's challenge.[8]

_____

[8] Even assuming arguendo that the district court abused its discretion by removing Juror No. 8, appellant must establish that the substitution of an alternate juror was prejudicial. See, e.g., Nelson, 102 F.3d at 1349. Appellant makes no such claim, much less a colorable one.

12

VI.

Appellant next contends that the trial judge should have declared a mistrial because of jury contamination arising from the incidents involving Jurors No. 2, 3, and 12 over the weekend of November 2-3. We disagree.

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial . . . ." Remmer v. United States, 347 U.S. 227, 229 (1954). The presumption of prejudice, however, is rebuttable. See id. Upon a showing of an external contact that may have been prejudicial, a trial judge should hold a hearing to evaluate the prejudicial impact of the external contacts on the affected jurors. See id. at 229-30.

As required by Remmer, the trial judge in this case held a hearing at which not only the jurors involved in the external contacts, but all of the other jurors as well, were individually questioned about the possible prejudicial impact of the contacts. All of the jurors said that the external contacts would not affect their ability to remain fair and impartial. In addition, the trial judge individually questioned each of the jurors involved in the external contacts ex parte. We conclude that the trial judge properly determined, based on his assessment of the jurors' assertions that they could remain fair and impartial, that no prejudice occurred from the external contacts, and therefore that a mistrial was not warranted.

Appellant further contends that the trial judge improperly granted the government's post-trial motion for leave to interview jurors and denied his own. A trial judge may allow a post-trial inquiry into the validity of a verdict only for the purpose of assessing "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed. R. Evid. 606(b). The trial judge in this case was justified in granting the government's motion because it was for the specific purpose of investigating whether the external contacts with certain jurors gave rise to possible charges of obstruction of justice. J.A. at 100 n.1. The appellant's motion, on the other hand, was in no way limited to the question of the external contacts, but sought

13

carte blanche to interview all of the jurors"to develop evidence in support of [appellant's] motion for a new trial." Id. at 95. Such a broad motion runs afoul of the limitations of Rule 606(b), which forbids inquiry into the mental impressions or emotional reactions of jurors during deliberations. See Fed. R. Evid. 606(b). Consequently, the trial judge correctly granted the government's motion and denied appellant's.**9**

VII.

Finally, appellant contends that there was insufficient evidence to convict him of conspiracy to distribute and possess with intent to distribute cocaine because the prosecution failed to identify any other individuals with whom he was acting in concert.

"[A] conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996) (en banc) (citation omitted). Provided that sufficient circumstantial evidence of the existence of a conspiracy, and of the defendant's involvement in that conspiracy, is introduced, it is not necessary that other members of the conspiracy be named in the indictment or otherwise identified. "At least two persons are required to constitute a conspiracy, but the identity of the other member of the conspiracy is not needed, in as much as one person can be convicted of conspiring with persons whose names are unknown." Rogers v. United States, 340 U.S. 367, 375 (1951).

Having reviewed the record, we conclude that there was ample evi-

_____

**9** Appellant argues, in the alternative, that he was entitled to an "equal opportunity to participate" in the government's investigation of possible jury tampering. However, appellant points to no authority for such an entitlement. Further, in granting the government's motion for leave to interview members of the jury, the trial judge assured appellant that he would review the results of the investigation in camera and turn over any information that would be relevant to appellant in preparing his motion for a new trial. J.A. at 104. However, because the investigation turned up no evidence of jury tampering, the trial judge simply had no information to turn over to appellant. Id. at 636-40.

dence for the jury to conclude that appellant was acting as part of a conspiracy. First, contrary to appellant's assertion, the prosecution identified a number of individuals with whom appellant may have been conspiring, even if none of the individuals was named in the indictment. As noted above, the prosecution introduced a substantial amount of evidence linking appellant with Daniel Brown, whom the prosecution alleged carried out the guns-for-drugs trade with Richard Eisenbarth on appellant's behalf. Further, the prosecution introduced evidence indicating that the telephone and alarm systems in the Temple Hills house were registered in the names of appellant's brother and sister, and in the address of a family member of appellant's girlfriend. Second, the prosecution presented the testimony of a narcotics expert, Jehru Brown, who indicated that the amount of cocaine found in the Temple Hills house suggested that appellant was a wholesale or retail distributor, not an individual acting alone. J.A. at 455. In view of all of this evidence, we conclude that a rational factfinder could have found appellant guilty of conspiracy, and therefore reject appellant's sufficiency challenge.

CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED

15