**UNITED STATES of America, Appellee,**

v.

**Arthur C. SHAVER, Appellant.**

**No. 80–5181.**

United States Court of Appeals,
Fourth Circuit.

Argued April 7, 1981.

Decided June 9, 1981.

---

Ronald W. Vaught, Erwin S. Solomon, Hot Springs, Va. (Erwin S. Solomon & Associates, Hot Springs, Va., on brief), for appellant.

Jean B. Weld, Asst. U. S. Atty., Roanoke, Va. (John S. Edwards, U. S. Atty., Thomas J. Bondurant, Jr., Asst. U. S. Atty., Roanoke, Va., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, WINTER, Chief Circuit Judge, and BUTZNER, Circuit Judge.

ALBERT V. BRYAN, Senior Circuit Judge:

Indicted for conspiring to transport stolen goods from Virginia to West Virginia, 18 U.S.C. § 371,[1] appellant Arthur C. Shaver was tried alone, found guilty by a jury as indicted, fined $2500.00, and placed on probation. Arliss G. Emmerich, jointly indicted as Shaver's co-conspirator, was not arraigned prior to Shaver's trial, as he was then a fugitive in Israel. Following extradition Emmerich was reindicted solely for the substantive offense of interstate transportation of stolen goods; however, at his trial the District Court struck the Government's case after rejecting its evidence of aiding and abetting, apparently because the indictment contained no such allegation.

Shaver appeals his conviction on the ground that the trial court erroneously denied his motions, seasonably made, for a judgment of acquittal, arguing that the evidence was insufficient to establish beyond a reasonable doubt that he conspired with Emmerich.[2] We agree, reverse and enter final judgment for the appellant.

At the time of his arrest Shaver was the Drill and Blast Superintendent, and Emmerich a foreman under him, for the Daniel Construction Company then engaged in the Bath County (Virginia) Pump Storage Project, a vast undertaking embracing construction of two dams and reservoirs, a complex of tunnels and a power house for the Virginia Electric and Power Company (VEPCO). The project called for extensive blasting of the land surface and of the subsurface rock. This work requires the drilling of numerous holes into the ground of the tract and the placing therein of powder and blasting caps. Copper wire is wrapped around this charge, run out of the hole, and connected with wire leads from other holes similarly loaded. More wire connects the grid to an electric power source. This wiring is destroyed by the blast, but there remain, untouched, "clippings" previously cut from the lengths of copper wire originally provided in the process of laying out and connecting up the network. These cuttings are short, from one to two or three feet long, and when their insulation is burned off they have a marketable value for the copper content. Consequently they are collected and are the property of the project material supplier, in this instance VEPCO. Although it is ap-

---

1. 18 U.S.C. § 2314 forbids any person to transport in interstate commerce "any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen." Shaver was indicted and tried only for conspiracy, not for the underlying substantive offense.

2. Shaver also appeals the Court's admission of the testimony of a witness who, despite its earlier grant of a motion to exclude witnesses, had remained in the courtroom. In view of our present decision directing acquittal we deem it unnecessary to consider this assignment of error.

parently a common practice to permit the blasting superintendent or crew to claim the clippings, at the Bath site VEPCO forbade the removal of any materials of value.

On February 25, 1980 Shaver was stopped at the project gate as he was leaving the site in a company truck commonly used by him. Several burlap bags of copper clippings were in the rear of the vehicle. Subsequent investigation revealed that Shaver previously had made six sales of copper clippings to one Belcher, a junk dealer in Caldwell, West Virginia; Emmerich, Shaver's foreman, had made twelve sales of like clippings to the same dealer.

While Shaver insists that he intended to return the contents of the truck when he next returned to work, and that his sales to Belcher consisted of clippings legitimately gathered from other projects, he appears to concede that the evidence at trial could support a conviction for theft or for interstate transportation of stolen property. As Shaver was indicted and convicted only of conspiracy, however, we are concerned with the sufficiency of the evidence to prove, beyond a reasonable doubt, each element of that offense.

Appellant contends, and we agree, that the evidence was inadequate to support a conclusion that the two men acted under any common, mutual or joint agreement, understanding or interest.[3]

We have gauged the proof by the standard enunciated in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in which, although upholding a conviction, the Court declared:

[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Id.* at 319, 99 S.Ct. at 2789 (footnote omitted).[4]

As evidence supporting the conclusion that an agreement existed between Shaver and Emmerich, the Government in part relies on the testimony of Albert Wood, a blasting crew employee. Wood testified that on February 25, 1980 he observed Emmerich at the blasting site loading bare copper clippings into his van, and subsequently driving his van down to the office trailer; that he saw Shaver's truck earlier in the day with empty burlap sacks in the rear—a common sight, according to Wood; and that later he saw Shaver's truck with full burlap sacks in the back. The Government asserts that Wood also testified to seeing Emmerich's van and Shaver's truck together at the office, and to observing Shaver leaving shortly thereafter with full burlap sacks in his truck. A diligent reading of the transcript portions cited by the Government utterly fails to support this characterization of Wood's testimony.[5]

---

**3.** No complaint is made of the charge to the jury. Indeed, it was exemplary, emphasizing that an essential element of the offense was agreement, without proof of which beyond a reasonable doubt there could be no conviction under the indictment. The District Judge sharply distinguished agreement from the other elements of the crime laid to Shaver—that is, a knowledge that the goods had been stolen and the transportation of them interstate.

**4.** This standard governs review of both Federal and State convictions. *See id.* n. 12; *Glasser v.*

*United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

**5.** The inferences that the Government would draw, that the bags in Shaver's truck contained copper transferred from Emmerich's van and that this demonstrates agreement and co-operation, thus are considerably attenuated. The reasonableness of such inferences is rendered even more doubtful when the statements of George Carey and Ronald Maxwell, Shaver's immediate superiors, are considered. Both testified that on the day he was stopped Shaver

The Government notes that Shaver and Emmerich sold clippings to the same junk dealer in Caldwell. It is difficult to assess the significance that a reasonable trier of fact could attach to this, because no evidence was adduced of the relative proximity to the Bath project of any other junk dealer.

One suggestion of joint action was the appearance, on two out of twelve receipts given to Emmerich by Belcher, of the license number of a truck owned by Shaver's wife. Although Belcher was called by the prosecution, he was not asked to identify or explain the notations; nothing in the record indicates who made the notations, or why they were made. Belcher did testify that he could not recall ever seeing Shaver and Emmerich together.

With regard to one vital element of conspiracy—agreement—this might well be categorized as a "no-evidence" case. *Thompson v. City of Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). We need not reach that far, however, since the proof so grossly fails to rise to the minimum level demanded by *Jackson*.

Reversed with Final Judgment.

had been directed to remove copper clippings and other debris that had accumulated in the powder storage trailer. Philip Lindsey, one of Shaver's foremen, further testified that he was ordered to clean up the trailer, and that he loaded the clippings into Shaver's truck.