**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 22-4121**

─────────────

UNITED STATES OF AMERICA,

          Plaintiff – Appellee,

    v.

BYRON JONES, a/k/a Brian Simms,

          Defendant – Appellant.

─────────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:20-cr-00254-RJC-DSC-1)

─────────────

Submitted: April 19, 2023                    Decided: May 31, 2023

─────────────

Before AGEE and WYNN, Circuit Judges, and Henry E. HUDSON, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

─────────────

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

─────────────

**ON BRIEF:** John G. Baker, Federal Public Defender, Megan C. Hoffman, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Dena J. King, United States Attorney, Graham R. Billings, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Byron Jones was on supervised release when he paid a purported financial advisor to file an application for a COVID-19 relief loan on behalf of his newly established business. The application contained multiple false statements, including inaccurate representations of the business' revenues and Jones' criminal history. After the application was approved, Jones received $143,000 in relief funds from the Government.

When the application's falsities were discovered, the Government filed a petition to revoke Jones' supervised release, asserting that Jones committed three violations of law in connection with the application. In his defense, Jones asserted that the financial advisor filed his application and included the false statements without his knowledge. The district court rejected Jones' argument and found that the Government proved that Jones committed the alleged violations by the required preponderance of the evidence. The court then sentenced Jones to twenty-four months' imprisonment and five years' supervised release but failed to orally pronounce his discretionary conditions of release. Jones appeals. For the reasons discussed below, we affirm the district court's revocation of Jones' conditional release but vacate Jones' sentence and remand for resentencing.

I.

A.

In November 2006, Jones was convicted of multiple offenses and sentenced to 240 months' imprisonment and ten years' supervised release. Jones served his custodial sentence and began his term of supervised release in November 2019. As a condition of

2

release, Jones was prohibited from committing another crime. This appeal stems from Jones' violation of that condition.

In April 2020, Jones incorporated a trucking business, Ramses Air Freight & Transport, Inc. (RAFT), in Delaware.[1] Shortly thereafter, as a routine part of Jones' supervision, Jones submitted financial disclosure statements to his probation officer, Asa Gravely. Jones reported that he was employed as a delivery driver and made approximately $1,400 in gross monthly wages. He also noted that he was self-employed and owned a business, RAFT. Jones did not disclose any wages associated with RAFT, but did inform Gravely that RAFT obtained a COVID-19 relief loan.

As a result, Gravely directed Jones to complete a business financial disclosure statement and provide supporting bank statements. Jones completed the form, noting that RAFT's bank account had a balance of $81,013.15 and that the business' only asset was a semi-truck. Jones had opened the bank account a few months earlier and funded it with a $25 deposit from his personal account. Jones did not disclose any accounts receivable or business income. Instead, Jones informed Gravely that the money in RAFT's bank account was from the COVID-19 relief loan. This information concerned Gravely, so he investigated further.

The investigation showed that the Small Business Administration (SBA) received an electronic application in June 2020 for an Economic Injury Disaster Loan (EIDL)

---

[1] In 1999, Jones incorporated a trucking business in Arizona with the same name. While Jones was in prison, that corporation ceased to exist.

3

pursuant to the Coronavirus Aid, Relief, and Economic Security Act.[2] The application consisted of two separate forms, a Rapid Intake Form and a Loan Authorization and Agreement ("Loan Authorization"). The following false information about RAFT was included in the Rapid Intake Form: (1) RAFT was incorporated in 1999; (2) it had $286,000 in gross revenues in the twelve months preceding January 31, 2020; and (3) it had non-profit/agriculture costs of operation of $138,389 in the twelve months preceding January 31, 2020. The Rapid Intake Form also falsely stated that the business owner had not been placed on parole or probation in the past five years. Lastly, the Rapid Intake Form indicated that it was not prepared by a third party and that no payments were made to a third party for application preparation services.

Based on the Rapid Intake Form, RAFT qualified for a $133,000 loan and a $10,000 cash advance. On June 30, 2020, the SBA deposited $10,000 into RAFT's bank account. Ten days later, Jones signed the Loan Authorization, which did not require Jones to include any substantive information. Instead, Jones was only required to certify that no fees had been paid to a third-party preparer other than those disclosed on the application and that all representations in the Rapid Intake Form were accurate. Jones signed the agreement under penalty of perjury. Three days later, the SBA deposited the full loan amount in RAFT's bank account.

---

[2] The COVID-19 EIDL program allowed then-existing small businesses experiencing economic injury caused by the pandemic to obtain loans to pay expenditures necessary to alleviate that injury. Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, §§ 1107, 1110, 134 Stat. 281 (2020).

Upon questioning, Jones informed Gravely that Shay Chambers, someone purporting to be a financial advisor and certified public accountant (CPA) in Ohio, prepared the application.[3] Jones paid Chambers $13,000 in exchange for the preparation and for performing certain additional financial services. He also explained that he told Chambers that RAFT's revenue was $286,000 because he believed the question requesting his "Gross Revenues for the Twelve (12) Months Prior to the Date of Disaster" on the application sought his projected revenue. J.A. 250. However, he did not clarify why he misunderstood the question or explain how he calculated the $286,000 projected revenue figure. Jones also stated that he never reviewed the Rapid Intake Form but acknowledged that he signed the Loan Authorization.

Thereafter, the Government filed a three-count indictment against Jones, charging him with wire fraud in violation of 18 U.S.C. § 1343, false statements in violation of 18 U.S.C. § 1014, and transactional money laundering in violation of 18 U.S.C. § 1957. The next day, the Government filed a petition to revoke Jones' supervised release in the district court. The petition alleged three new violations of law corresponding with the three counts charged in the indictment.[4]

B.

In January 2020, the district court held a revocation hearing, during which Jones conceded that fraud occurred, but contended that he lacked the necessary mens rea to

---

[3] Although the parties do not specifically say so, we glean from context that Chambers was neither a legitimate financial advisor nor a CPA.

[4] The district court later granted the Government's motion to dismiss the indictment.

5

establish any violation of law because Chambers filled out and submitted the Rapid Intake

Form and Jones did not know that it contained false statements.[5]

Opposing that position, the Government provided evidence that it argued proved

that Jones knew about and participated in the fraud. For example, in addition to the

evidence recited above, the Government presented Jones' bank statements, which showed

that in the three months following receipt of the loan, Jones transferred more than $19,000

of the loan into his personal account, which he categorized as CEO salary payments.[6] The

Government also introduced evidence that the additional financial services that Chambers

allegedly provided in exchange for the $13,000 consisted solely of a five-year business

forecast, which was only four pages long, included multiple typographical errors, and

projected that RAFT's 2020 income would be $364,000.

The Government argued that this evidence demonstrated that Jones had the requisite

mens rea for the alleged violations. It first asserted that Jones must have been involved in

the fraud because Chambers could not have filled out the application without Jones'

assistance, and that she had to obtain Jones' email address, phone number, and the 1999

---

[5] Each of the alleged crimes requires either an intent to defraud or knowledge of the falsity: Wire fraud requires the government to show the defendant "devised or intended to devise a scheme to defraud," which in turn necessitates "that the defendant acted with the specific intent to defraud." *United States v. Wynn*, 684 F.3d 473, 477–78 (4th Cir. 2012) (cleaned up). A conviction for making false statements demands that the defendant "knowingly made the false statement[s]." *United States v. Smith*, 29 F.3d 914, 916 (4th Cir. 1994). And to prove money laundering, the government must show that the defendant "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property." 18 U.S.C. § 1957(a).

[6] The loan was also used for various business-related expenses, such as the purchase of a semi-truck and insurance.

6

incorporation date from Jones, evidencing his involvement in the fraud. Additionally, the Government contended that Jones' $13,000 payment to Chambers demonstrated Jones' participation in the fraud because the SBA prohibited a business owner from paying a third party more than $2,500 to fill out a loan application and Jones' much larger payment indicated a fraudulent scheme. Although Jones asserted that the $13,000 included payment for other financial services in addition to the application preparation, the Government pointed out that the only evidence of other financial services was the four-page financial forecast, which the Government posited was a cover up. The Government further argued that the forecast was a "sham" because it was "full of errors and things that don't make sense" and was dated the same day as the $13,000 check and the day after the loan was deposited into Jones' account. J.A. 134–35. Finally, the Government contended that, at a minimum, Jones was willfully blind because he could not have believed that he was entitled to the money after just starting his business upon his release from prison.

In his defense, Jones introduced text messages and email correspondence between him and Chambers, which indicated that Chambers filled out and submitted the Rapid Intake Form. For example, an email from Chambers to Jones stated, "Application submitted," and provided an application number. J.A. 113. Jones also introduced evidence that the EIDL application was submitted from a device in Cleveland, Ohio, where Chambers was located.

Additionally, Jones called Randy Walker, an expert in the field of polygraph examinations. Walker testified that he conducted a polygraph examination of Jones and asked him four relevant questions: (1) whether Shay Chambers prepared and signed the

application, to which Jones answered "yes"; (2) whether Jones ever saw the application, to which he answered "no"; (3) whether Jones knew Shay Chambers was lying on the application, to which he answered "no"; and (4) whether Jones believed he was eligible for the EIDL because it was based on business projections, to which he answered "yes." J.A. 127. Walker stated that the examination "indicated that [Jones] was being truthful when he made those assertions." J.A. 130.

Jones represented that this evidence supported his contention that Chambers submitted the loan application and that Jones never saw the Rapid Intake Form, which was the only document that included the false statements. Although he signed the Loan Authorization, certifying that everything in the Rapid Intake Form was true, Jones maintained that he genuinely believed that everything was true and therefore did not intend to commit fraud. Lastly, Jones argued that he was not willfully blind; he was simply not a sophisticated business owner and erroneously but reasonably relied on the advice of a purported financial expert.

The district court concluded that the Government proved its case by a preponderance of the evidence, as is required for the revocation of supervised release. It reasoned that "plenty of information included in that application had to come from Mr. Jones, including the startup date of 1999." J.A. 146. Without the inclusion of the 1999 date, the district court noted, "it would [have been] obvious that he was not eligible for the loan" because it would have been clear that he did not have any revenue in the previous twelve months, a prerequisite for obtaining relief. J.A. 146. The district court also explained that the "$286,000 [projected revenue] number is pure fiction. Not based upon any history of

8

performance, any number of employees[. A]ll these things were false statements that were provided to obtain the loan in a fraudulent way." J.A. 146–47. At the very least, the district court determined that Jones was willfully blind because "[y]ou just don't certify . . . factual information to get a six-figure loan without making a reasonable inquiry." J.A. 147.

Thereafter, the district court sentenced Jones to twenty-four months' imprisonment and five years' supervised release. The district court did not orally pronounce any specific conditions of supervised release, but a later written judgment included four mandatory and nineteen discretionary conditions.

Jones timely appealed, bringing three challenges. First, Jones asserts that the district court abused its discretion by revoking Jones' supervised release because he did not have the necessary mens rea to commit the alleged violations of law. Second, Jones argues that the district court erroneously failed to pronounce Jones' discretionary conditions of release. Finally, Jones contends that his sentence is procedurally unreasonable because the district court predominately based his sentence on the seriousness of his offense.

We have jurisdiction under 28 U.S.C. § 1291.

II.

Jones first argues that the district court abused its discretion by revoking his supervised release. We disagree.

If a court "finds by a preponderance of the evidence that the defendant violated a condition of supervised release," it can revoke the defendant's release and "require the defendant to serve in prison all or part of the term of supervised release." 18 U.S.C.

9

§ 3583(e)(3). "We review a district court's ultimate decision to revoke a defendant's supervised release for abuse of discretion," evaluating the court's factual findings underlying the revocation for clear error. *United States v. Padgett*, 788 F.3d 370, 373 (4th Cir. 2015). "Clear error occurs when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Harvey*, 532 F.3d 326, 336–37 (4th Cir. 2008) (cleaned up).

As noted, one of Jones' conditions of supervised release prohibited him from committing any new violations of law. Jones contends that he could not have had the requisite mens rea to commit any of the alleged violations because he presented evidence that Chambers prepared and submitted the Rapid Intake Form that contained the false representations about which Jones had no knowledge. This understanding of what happened, he suggests, is bolstered by the fact that he opened RAFT's bank account prior to communicating with Chambers and the fact that he voluntarily informed Gravely about the EIDL. Jones posits that he is simply an unsophisticated person who justifiably relied on a purported expert.

But, to the contrary, there is ample evidence that Jones provided false information to Chambers and did not simply rely on her advice as an alleged expert. Most obviously, Jones admitted that he provided the $286,000 revenue figure to Chambers. Although he contends that he believed that the pertinent application question asked for future projections, even if that's true, that figure has no support. Jones offered no basis to believe that he would make $286,000 in the next year, especially considering that he had recently

10

been released from prison and had just incorporated the business. That figure alone was a false statement that Jones used to obtain the loan and sufficiently supported the alleged violations.

Additionally, there is evidence suggesting that Jones paid Chambers to commit the fraud. Jones paid Chambers $13,000 to fill out the application—much more than was allowed—indicating a fraudulent scheme. He suggests that the money included payment for additional financial services, but the only evidence of other services provided by Chambers was the forecast, which the district court reasonably concluded appeared to be a cover up for the fraud. The forecast looks illegitimate, contains many typographical errors, and predicts high success for a brand-new business.

Further, after receiving the money, Jones paid himself over $19,000 without disclosing the income to Gravely or explaining how he earned that money, providing even more evidence of fraud. Thus, the district court's account of the evidence—finding that Jones had the requisite mens rea and did not merely rely on Chamber's alleged advice in good faith—has ample support in and is plausible in light of the record.[7] *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it[.]"). Accordingly, we affirm the district court's revocation of Jones' supervised release.

---

[7] Because we agree that there is sufficient evidence that Jones had the requisite intent to defraud, we do not discuss the court's alternative finding of willful blindness.

III.

Nonetheless, we agree with Jones—as does the Government—that the district court erroneously failed to orally pronounce Jones' discretionary conditions of release at the revocation hearing. *See United States v. Singletary*, 984 F.3d 341, 345 (4th Cir. 2021) ("[T]o sentence a defendant to a non-mandatory condition of supervised release, the sentencing court must include that condition in its oral pronouncement of a defendant's sentence in open court."). Accordingly, we vacate Jones' sentence and remand for resentencing. *See United States v. Rogers*, 961 F.3d 291, 300–01 (4th Cir. 2020).[8]

IV.

For the foregoing reasons, we affirm the district court's revocation of Jones' supervised release. However, we vacate Jones' sentence and remand for resentencing.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

---

[8] Because we remand for resentencing, we need not consider Jones' additional argument that his sentence was plainly unreasonable because the district court predominantly relied on impermissible sentencing factors. However, we note that "in fashioning a revocation sentence, 'the court should sanction primarily the defendant's breach of trust, while taking into account, [only] to a limited degree, the seriousness of the underlying violation and the criminal history of the violator.'" *United States v. Webb*, 738 F.3d 638, 641 (4th Cir. 2013) (quoting U.S. Sent'g Guidelines Manual ch. 7, pt. A(3)(b) (U.S. Sent'g Comm'n 2012)). The sentencing court "may not impose a revocation sentence based predominately on the seriousness of the releasee's violation or the need for the sentence to promote respect for the law and provide just punishment." *Id.* at 642. To do so would make the sentence procedurally unreasonable and would be grounds for remand and resentencing. *See United States v. Pennington*, No. 21-4664, 2022 WL 2702577, at *2 (4th Cir. July 12, 2022).

12